My name is Paul Achitoff, and I'll be arguing for the appellants. Could you wait for just a moment before we clear the park and close the door? Thank you. My name is Paul Achitoff. I'll be arguing for the appellants. I would like to reserve three minutes of my time for rebuttal. My clients are challenging orders preventing members of the public from learning where on the islands where they live their government allowed, in violation of federal environmental laws, in unmarked open fields, field tests of crops genetically engineered to produce powerful drugs and other biologically active compounds. Can I stop you for a moment to get back to what this case was originally about? This was a case in which you wanted relief under various environmental statutes. Is that correct? Correct. You thought that there should be further study of what the government was going to do with these plants before they did it. Is that right? Essentially. Our allegations, and we prevailed on our claims, that the government was required to do environmental studies under two different environmental laws before they issued the permits that they did issue. Okay, so you won. Correct. And the main issues are now back for further environmental studies. Those studies are not being done. The field tests that were the subject of them aren't done. They were completed five years ago. They were completed before this sealing order was issued, and therefore there is no purpose to doing studies after the fact. Well, what you want now is to open up to the public some information that was sealed during the course of the case that's now over. Correct. Correct. The public has a right of access to this information. We feel that it's important that the public knows what its government did in this case. And you represent who? I represent the plaintiffs in the underlying lawsuit. Okay, and that's the Center for Food Safety and other organizations that are concerned about food safety. I guess what I'm getting at here is what you're bringing, this appeals about the kind of classic thing that we have when newspapers want to represent the First Amendment interests that they have in the public's right to know and in freedom of the press. I'm not quite understanding why your client, who has gotten everything that they wanted when they went into the litigation, is still pursuing this appeal, and why this isn't just an interlocutory kind of order like a discovery order that becomes moot when you won the case. Because this type of order does not become moot regardless of what happens to the merits because the propriety of the order has to be assessed with regard to the circumstances at the time, at the time the order was issued and at any subsequent point in time. Because the public has an ongoing right of access to court files. If an order like this is not challenged, regardless of underlying circumstances or changes in those circumstances, then effectively what you have is the record is sealed forever. Yes, but you see, if this were really, there's no newspaper or anyone representing the public's interests here who wants this open. So I'm just wondering why we're having to hear an appeal when the case is over and this is just something that happened during the course of the litigation. Let me ask it another way. Could you have brought some kind of a writ in order to challenge the order on an interlocutory file for some kind of writ if you thought that this was an abuse of the district court's discretion to leave this sealed? The way that we see writs on discovery orders and other interlocutory kind of orders? To be frank, Your Honor, I don't know whether I could have done that at the time. I can't say. You don't see any reason why you couldn't? Not off the top of my head. But I think that my clients have always been, in this case, bringing this type of litigation, in this case and in others, on behalf of what they perceive to be the public interest. These are all public interest nonprofit organizations who brought their underlying claims in the same way. Yes, they have standing, and that was established based upon their own membership. However, clearly their interests are on behalf of the public and not merely on behalf of their own organization and their own members. Do you have any authority for that proposition, that you're representing interests apart from your members? No, Your Honor. Let me ask you a question, counsel. What is the standard of review on this particular motion? The standard review is abuse of discretion. Okay. And as I understand it, this whole matter arose generally because the APHIS, which is an agency, had allowed specific conduct that your organization wanted to challenge, correct? Yes. And the APHIS is, in fact, an agency of the federal government that the federal government has kind of set up to try to monitor these kind of situations. Is that also true? Yes. And your particular idea under this was that they had done their job wrong, and therefore the district court ought to help you out and change what they had decided. No, we wanted the district court to rule as it did, which is that they violated the law by failing to do certain environmental studies prior to issuing the permits. Okay. That's probably better said than my question. However, in the process, the district court has to determine discovery-type issues. In other words, they have to determine what they're going to allow discovery to be, what has to be sealed, what ought not to be sealed. And in this process, where the district court, in fact, said that the agency was wrong by what they did, the district court said, but nonetheless, in this kind of a situation, under my discretionary power, I'm going to give you some information, but the locations of the field tests I'm not going to give you. Right? Well, that's what I said. You know. You know the answer. I do. And you just want to public. You just want to publicize that. But just to follow up on what Your Honor is saying, initially, what the magistrate said was. . . I'm not talking about. . . You're talking about the ultimate order? I'm talking about the ultimate order. Correct. Because we're not here enforcing the magistrate's order here. All right. We're here talking about the district court's decision. All right. The district court was the ultimate decision maker in whether you got the overturning of what the agency did. The district court now says, given all my discovery, given everything I've gone through, given what I know about this case on an abuse of discretion basis, I'm not going to give you this information, and you're now asking me to undo that abuse. Correct. Given that situation, why should an appeal court, who now is operating on a discretionary basis, get into the process, which we don't know, we're not allowed to get into, we only know what is in the record. The district court understands all of the process, understands what the situation is, and we're looking at an abuse of discretion here. This is the kind of stuff that happens on injunctions, where there's some of our court who might want to give an injunction as it relates to an agency, and there's some who aren't, but because the district court's got all the information in front of it, and if it has a hearing, we give all kinds of discretion to the district court. Now you want us, who had all the hearings necessary, to undo this. Why should I, on abuse of discretion? Understood. Well, under an abuse of discretion standard, the reversal is appropriate, where the discretion is exercised to an end not justified by the evidence, or if the court fails to make required findings. We have a specific standard that's been set forth in the Kamakana case and in the Fultz v. State Farm case, which expressly says as follows, the standard for entering this type of order imposes a strong presumption of public access, it demands that there be shown compelling reasons to seal, it requires a conscientious balancing of all of the interests and relevant factors, it prohibits nonessential restrictions, it prohibits sealing absent an articulated basis supported by specific factual findings, and it prohibits making an order of sealing based on hypothesis or conjecture. And in this case, that standard was violated. So why wasn't there compelling evidence here to warrant the sealing? They did produce some documents. They produced quite a bit, actually. They produced nothing to indicate what is on those sites at the time of the sealing, let alone what may be on those sites today. If you look closely at the declarations that were submitted, what you find is that there is no pattern of vandalism that has ever been established in Hawaii with respect to these types of situations. They pointed to vandalism in other areas. They did. They pointed to destruction of animal laboratories. They pointed to all kinds of things that they tried to lump into an argument that there are bioterrorists roaming the world that will seize on any opportunity to commit crimes. But in Hawaii, we have had literally thousands of field tests of genetically engineered crops, and the only evidence over the 10 years that this has been going on that the defendants were able to come up with was one alleged incident that happened eight years ago based on hearsay evidence that we moved to strike. The court didn't rule on it. Well, this was ordered sealed during the course of the litigation, right? Yes, just prior to the hearing on the motion for summary judgment. Summary judgment, yeah. Yes. And so what you wanted, and still not quite understanding procedurally, what you wanted in the litigation was further study, and you won, and it went back, and yet you're saying no more further study was done, and everything's moved. Well, essentially what we got was declaratory relief because by the time the summary judgment was decided, the field tests had run their course, and therefore it was acknowledged that there was no point in doing an after-the-fact study of something that no longer existed. So the underlying litigation was essentially moved? Well, the argument was made that it was moved, but that was not the outcome of the motion to dismiss that was made on the basis of mootness because these field tests take such a short time that the court concluded that these types of things can be repeated and there would never be an opportunity to review them. So the fact is the field trials were over. There was nothing there that anyone could vandalize, even if they wanted to. There was no evidence that anyone ever would, that anyone ever could, and yet the court said, we are not going to allow the public to know where the government allowed these tests to occur ever again. Well, why do they have to wait for somebody to vandalize it? I'm not saying that he does, but you do need to have much better evidence than you have. If this had been brought for – if this had been sealed at the time the field tests were going on, for example, and if there had been evidence of a pattern of vandalism of this type of thing in Hawaii over the years when there was a lot of opportunity for this. As I said, we have thousands of similar field tests that have occurred. We have commercialized genetically engineered crops in Hawaii that nobody vandalizes and so forth. If the circumstances had been different, that would be a different case, and we're not here asking the court to make a general rule that this type of material can never be sealed in an appropriate case. We're saying in this case where the evidence did not show that there existed anything on these sites anymore or that there would ever be anything on these sites or that there was anybody who it was reasonable to suppose might commit vandalism. They weren't only concerned about vandalism. They were also concerned about a competitor coming in and snatching a few little seedlings. And over the two years that the defendants were given the opportunity repeatedly to come up with evidence to support their confidentiality arguments, they did not provide any evidence whatsoever that anyone – had ever committed the type of industrial espionage that they said they were concerned about. And also, frankly, the industry intervener bio that was really the force behind these arguments, it's their own membership that would be the only people that have any motivation to do this. So basically what they're saying, to your honor, is prevent the public from having its right of access so that our membership doesn't have an opportunity to do unlawful acts. If nothing is happening here and nothing's going to happen to these sites, and you, for purposes of litigation, had knowledge of where they were so that you could litigate what problems there were, and if you ultimately got the relief that you wanted when you filed the litigation, which was that there had to be certain studies before these kinds of crops could be planted, then why are – what value is there now that the litigation is over and everything is done and nothing's going to happen? What possible public interest is there, assuming that you can represent that interest other than the interest in your plant? What public interest is there in getting this information out? The public has a right to know what its government has done, and without knowing the location, it's in a complete contextual vacuum. I can say that I personally have been asked on many, many occasions by people who know that I litigated this case, so where are these field tests? And I say, I'm sorry, I can't tell you. So there's no question that people would like to know. And reporters ask me many times, and I said, I'm sorry, there's an order in place. Thank you. You have used your phone. We've helped you use it, too. Good morning. I'm Marjorie Bronster, and I represent the Biotechnology Industry Organization, the intervener in this case. And we bio-intervened in this case fairly early on, when it became clear that Center for Food Safety was seeking this information and wanted to make it public. And when we intervened, we did so on behalf of our members, who were concerned about the implications of having their trade secrets simply splashed across the Internet, in a case that was whether or not the federal government, and that's APHIS, A-P-H-I-S, was meeting its requirements. Well, what was the federal government's position in this? With respect to confidentiality? Yes, the sealing order. The sealing, to the sealing. They believed that it was important to keep it sealed as well. And I believe that, I mean, they joined in us with BIO on our request to seal. In fact, before BIO even intervened, there was a motion to compel production of this information, and the government said, we don't want it disclosed either. In fact, we are compelled by our policy and law not to disclose it, and we think that it would be a bad idea for the public purpose and our whole procedures. And they did not want it disclosed. Did you intervene on the basis that your interests weren't being represented by the government, or what was the big issue? There was a concern that in terms of knowing truly what made these things confidential and proprietary information, that we could share more details about the science and the impact on our members' business when it came to what the potential implications were. So our intervention was limited to the issue of disclosure and remedy, which is where the impact on our members would be. Judge Smith was emphasizing how this was a discretionary ruling on the part of the district court, and for us, our review is for abuse of discretion. But as I understand it, when the district court exercises discretion, it's supposed to be consistent with applicable legal standards. And there, as I read the law, the showing that had to be made, because it's in connection with the motion for summary judgment, is you had to make compelling circumstances that would warrant the sealing order. Now, what is it about the evidence you presented to the judge, to the district court, that suggests the compelling circumstances? I think there was quite a bit of it. And I think that if you look at the record as a whole, this is an unusual disclosure case, because most of the disclosure cases that come up are where the parties stipulate to a protective order, the court simply goes along with it, and there's really been no review. In this case, there were reviews of the evidence for a period of almost two years, and many, many, many submissions. And what the evidence showed in those submissions was, number one, that the plants at issue were confidential and proprietary, and that the scope of where they stood in the process was something that was very well protected by the various companies. You know, what I don't understand is, in order to do an adequate study of what environmental effects a particular planting might have, a planting of these kinds of crops might have, don't you have to know, doesn't the, don't you have to know where they are, where they're located, so you might know possibly what might be arguably contaminated by pollen or by some of the spread of these crops? Oh, yes, Your Honor. But is that not, when the agency does this evaluation, is that not, is that all secret too? No, the agency knows. Yeah, but when it does an environmental assessment, doesn't that have to be published someplace? When the agency is looking into these issues, the agency is well aware of where it is. It is supposed to do the analysis in context, and we had no problem with any of that. But in their analysis, do they disclose the location? No, I don't believe that they do, and we don't believe that it's necessary for them to do so. But in this case, one of the issues below was the Plant Protection Act. Is that analysis subject to, is that published in the Federal Register, and was that subject to notice and comment, and how could that work if you don't know where it is? Well, it is subject to notice and comment, and it is generally described. The question is whether or not the pinpoint locations are described, and what the court below decided was that in a weighing of whether or not the public had a right to know, they said general locations will let you know. Like Hawaii? No, it was far more specific than that. Maui? Well, one of the things was the island, but it was, I mean, Waipahu or on Moloka'i, or, I mean, there were relatively small areas, and they did say it was near the Wailua River, and there were some other very specific facts in there. And at one point, we objected on the grounds that people might have a pretty good sense of where it was, and we were overruled, and the court below made a balance and said, okay, the general locations, we will make public, but not the pinpoint locations, because we believe, and they believe the evidence that suggested that it would expose it to a greater likelihood of vandalism and the potential for the theft of industrial information. I'm interested in my colleague's questions, because as I summarize the center's argument, it is, the experimental crops have been harvested. The permit holders fail to even claim they intend to use the particular sites in the future. No evidence was introduced establishing any specific likelihood of vandalism. The threat of vandalism was no more than supported hypothesis or conjecture, and no one can steal trade secrets at this time. How do you respond to that when it's all over? Okay. There are a number of responses, Your Honor. First, there was evidence in the record that stated that these fields were likely to be used again for precisely the same type of research. And we are not in California or in the Midwest where there are thousands and thousands of acres available. We have relatively limited agricultural acreage in the state of Hawaii. And so when they are using fields, the idea that they would be used again and again should not come as any great surprise. And there was evidence in the record. Second, to the suggestion that there was no evidence in the record of the former, the earlier acts of espionage, I mean, I'm sorry, of vandalism, we had the declaration of Jerry Aoka, who specifically said that he was on Kauai when the self-proclaimed Menehune came and destroyed the crops because they believed they were biogenetically engineered. So this is not a situation – and that occurred in the year 2000. These events, when we were involved in it, were 2004. Yes, now it's 2008. But we were quite surprised that we would have this tail wagging the dog after everything below had been resolved. What about trade secrets? The trade secrets? There is plenty of evidence in the record showing that all the permittees believed that the plants that were genetically engineered constituted trade secrets. But they're not there anymore. Those particular plants are not. But again, the idea was that a lot of these fields were being used again and again so that you would have somebody who would rent a field and would use it for one company and then enter into a contract to do it for another company. And it was that that the judges believed was an important factor. And again, the question is, wasn't an abuse of discretion for them to determine that the trend was towards more vandalism and the risk did exist for the theft of trade secrets? May it please the Court? I'm David Shilton from the Department of Justice, representing the Animal and Plant Health Inspection Service, or APHIS. And in the year 2000, APHIS determined that it was appropriate to allow companies seeking permits to keep the location of field tests confidential in their applications because of the threat of vandalism. And there's a memorandum in the supplemental excerpts of record, page 15, which sets that out. And this is not a conjectural threat. It has happened in a number of places, as counsel explained. It has happened in Hawaii. And certainly that justifies a need to keep those field test locations sealed. And it wasn't an abuse of discretion for the district court to do that. I don't think that the plaintiffs are here claiming that the district court misapplied the law in any way. It's simply a judgment call based on a factual record that there is a compelling need to keep these field locations sealed. And that since there is evidence in the record that these fields are used year after year, that that need for the sealing still exists. So how would you answer directly Judge Schroeder's question about what does APHIS do when they approve or analyze an application to conduct these studies? What is disclosed to the public? The exact location of the test plots is not revealed. How specific? Well, counsel was, you know, she said, I said Hawaii. She said, no, no, it's much more specific than Hawaii. Well, the general rule that APHIS has used is to reveal the county where it's occurring. But the – Is that a national policy? I'm not quite sure I understand that. Yes. APHIS now is doing environmental assessments. The problem in this case – Well, I mean, so if it's a plot in Hawaii, then you would disclose Maui? And if it were in California, you would disclose Orange County? Is that – APHIS could disclose with more detail if it was necessary. But in most of these cases, the issues surround the methods of confinement. What, you know, how much fallow land are you requiring around the field? What are the other requirements? And they don't really relate to, you know, where the particular field is. So it just hasn't been necessary in these cases to say that the particular field is here, the coordinates for it. And we don't really have a challenge to one of the new environmental assessments here. The problem in this case is that the – on the merits, the APHIS was relying on a categorical exclusion, and the district court found that it hadn't adequately explained in the record, you know, why that exclusion applied and whether there weren't extraordinary circumstances. So APHIS has gone on to fix that problem. It's now doing environmental assessments. But whether those are adequate or not is for a future case. Here, the only issue that's left is whether the district court used its discretion in keeping this material sealed. And I think given the showing that vandalism is a threat, that that's sufficient to supply that compelling need. It wasn't too specific. The showing of vandalism, the fact that there was evidence of vandalism in Hawaii and in other places. On one occasion. On one occasion. But it's reasonable to take, you know, precautions, knowing that there's a general threat, even if there hasn't been a terribly recent incident. Was the need – was the standard of compelling need before the district court, was that debated at all in the papers before the district court? Absolutely. In fact, it was the district court who brought it – brought up the Kamakana case and said, you know, what the compelling need is. And so the parties went in with their evidence. First, the magistrate reviewed it all, made his decision, and then the district court reviewed it. So, yes, absolutely, the compelling need standard was directly applied. And you had a factual record to show that this was not a conjectural sort of fear. Just one last question. Does ACOS's position about this nondisclosure, is that based on sort of the possible threat of vandalism, or is it also based on, you know, on the trade secrets? It's based on both. On both. The problem with trade secrets is the persons who conduct espionage don't tend to go onto websites and claim credit for it. And so it's very difficult to point to particular instances of theft of business information. It just happens that with the vandalism, you have these website claims. So – but it's out there. It is a threat. Thank you. One second, please. Can you say anything very briefly? Yes, I'll be very brief. Very brief. With respect to the purported or the claim that there was evidence in the record that these fields would be used repeatedly, all I can say is the court needs to look at that evidence, and it will see how lacking it is, because this is a very site-specific, evidence-specific appeal. It is not – and the evidence – We will look at it. Yes. I mean, we have to look at each site to see is the evidence there to create a compelling reason. With respect to the claim that there was a trend of vandalism, to the contrary, Judge Ezra, who was the district court judge before Judge Seabright issued this ultimate ruling, had actually denied a protective order even under the good cause standard after this incident of alleged vandalism on Kauai had been brought to light. He said this still doesn't meet the good cause standard. We understand, and we will fully – we're way over time now, and I appreciate – we appreciate the break. Thank you. Thank you. Thank you. The case just argued is submitted for decision. The court does appreciate the argument of both sides. We'll hear the last case for argument, which is United States v. Elliott.
judges: Schroeder, Paez, Smith